IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


UNITED STATES OF AMERICA,

                    Plaintiff,

        Vs.                                        No.  08-40058-01-SAC

RAMIRO GIL SANCHEZ,

                    Defendant.


MEMORANDUM AND ORDER

            This case comes before the court on the defendant Ramiro

Sanchez's pretrial motion to suppress all evidence that Shawnee County

Sheriff ("SCS")'s deputies seized from his person and from the pickup truck

he was driving on April 19, 2007.  (Dk. 61).  The defendant also seeks to

suppress all testimony concerning said evidence including testimony on the

testing and examination of said evidence.  The defendant's motion

challenges the lawfulness of the traffic stop and concludes that any

consent subsequent to the search was tainted by the unlawful seizure.

Specifically, the defendant argues that dispatch's report to the officer that

the temporary tag number on the pickup truck was "not found" did not

provide the reasonable suspicion necessary for a traffic stop.  The

1

defendant also argues that the statute cited by the deputy on the defendant's warning ticket, K.S.A. § 8-133 (governing the display of vehicle license plates), did not provide lawful authority for the stop.  Finally, the defendant questions whether his consent to the officer's request to search was knowing and voluntary.

**INDICTMENT**

The defendant is the sole person named in the indictment that charges him with:  Count one, conspiracy to possess with the intent to distribute and dispense 500 grams or more of methamphetamine between on or about April 19, 2007, and on or about October 25, 2007; Count two, laundering of monetary instruments on or before April 19, 2007; and Count three, traveling in interstate in aid of racketeering enterprises on or before April 19, 2007.

**FACTS**

On April 19, 2007, at approximately 5:30 pm, Senior Special Agent ("SSA") Tim Leakey of the Kansas Bureau of Investigation ("KBI") was notified by employees of Orscheln's Farm and Home Store that at approximately 5:10 pm that day two Hispanic males used cash to purchase

four pounds of MSM (an odorless white powder used in treating animals[1] and also used as a common cutting agent for methamphetamine). The two men were seen driving a gold Chrysler Cirrus bearing a Kansas thirty-day permit (#055330).[2]

Earlier that day, the same gold Chrysler Cirrus had been seen multiple times at 3100 S.E. Colfax Street, Topeka, Kansas, where agents of the KBI and Drug Enforcement Administration ("DEA") were conducting surveillance based on information that the residence had strong ties to a suspected drug-trafficking ring.[3]  During the surveillance, several Hispanic men were observed going into the detached garage that stored a tan-colored Chevy 1500 pickup truck bearing no license plate.  They also saw

---

[1]One pound of MSM would treat one horse for one month.  None of the suspects being investigated were observed in proximity to horses or to farms or ranches having horses.

[2]During the previous eight  months, on at least 19 occasions, various Hispanic men purchased or attempted to purchase MSM with cash from Orscheln's Farm and Home Store.  On most occasions, they drove motor vehicles having temporary Kansas tags, and some of those tags could not be verified as lawfully issued.  In some instances, they appeared to be using different temporary tags on the same vehicle.

[3]The KBI had traced some of the MSM purchases to a residence at 3221 Irvingham St., Topeka, Kansas.  The water at that residence was registered to Diana Apodaca.  After a mini-van connected with another MSM purchase was observed at the Colfax residence, officers discovered the electricity at that residence was registered to Diana Apodaca.

the gold Chrysler Cirrus leave and return several times that day.

At approximately 5:35 pm, SSA Leakey saw the gold Chrysler Cirrus at the residence at 3221 Irvingham Street, Topeka, Kansas, which was under surveillance as another possible stash house. Special Agent ("SA") John Shannon with the DEA then informed SSA Leakey that the pickup at 3100 S.E. Colfax was backing out of the garage and that Hispanic men had been seen loading the truck with different things, including white trash bags. SSA Leakey drove back to 3100 S.E. Colfax and saw a Hispanic man loading another item into the pickup. SSA Leakey also noted that the pickup truck now had a Kansas thirty-day tag attached (#090320). Surveillance officers observed two Hispanic men have a brief conversation before one of them got into the truck and drove away around 5:47 pm. While following the truck, SSA Leakey noted that the driver was the same Hispanic man who had been seen loading items into the truck earlier.

At the hearing, SSA Leakey explained his suspicion that the temporary tag on the pickup had been illegally acquired. He thought it unusual for the temporary tag to appear suddenly on the pickup that had been parked in the detached garage. Additionally, their investigation had

4

discovered other vehicles involved in this drug trafficking ring that had temporary tags some of which appeared to have been purchased illegally from dealers in Kansas City, Kansas, and surrounding areas of Topeka.

The SCS deputies joined the surveillance as the truck began traveling west on Interstate 70. Deputy Kiley Rice instructed Deputy Jesse Foster to perform an interdiction stop on the truck. Deputy Rice had been cooperating with the DEA's surveillance of this suspected drug-trafficking ring. Deputy Rice informed Deputy Foster that the pickup truck was involved with an ongoing investigation of suspicious MSM purchases and that the driver needed to be identified. Deputy Rice did not otherwise indicate to Deputy Foster what type of contraband might be present in the vehicle.

Deputy Foster contacted dispatch with the pickup's temporary tag number and was told that the tag was not found. Deputy Foster testified he had been trained that upon receiving such a report from dispatch he was to stop and check the vehicle's registration, because this report meant either the vehicle was not registered or there was a problem with the state system. Deputy Foster also testified that the pickup's ball hitch blocked his view of the temporary tag from behind and that he could

read the tag only after pulling up parallel to the tag.  Deputy Foster

proceeded to stop the pickup truck near mile marker 351 on Interstate 70 at

approximately 6:05 pm.  SCS's Deputies Glenn Hawks and Kiley Rice

arrived on the scene shortly thereafter.  The driver produced a valid

Arizona Driver's licence that identified him as Ramiro Gil Sanchez.  The

Certificate of Title, printed April 4, 2007, showed that Villa Nero owned the

vehicle.  There was also a Kansas Thirty-Day Temporary Permit, dated

April 19, 2007, showing Villa Nero as the seller and Ricardo Villareal-Tirado

as the purchaser.[4]  The signature in the dealer block at the bottom of the

document was illegible.  Initially, the defendant indicated that he did not

own the truck but that it belonged to the person on the registration paper.

But later in the stop, the defendant told another officer, "I just buy this."

There was no documentary evidence to show that he had purchased the

truck.

Deputy Foster gave the defendant a warning ticket, citing

_____

[4]The name and address on the temporary permit, Ricardo Villareal-
Tirado, 405 Golden Ave, Topeka, Kansas, matched the name and address
on another temporary tag found on a Chevy Safari used April 1, 2007, to
purchase eight pounds of MSM from Orscheln's Farm and Home Store.
(Govt. Ex. 20, ¶ 40).  The government's exhibit, however, does not
establish that any officer was aware of this connection at the time of the
traffic stop.

K.S.A. § 8-133 for improper display of the temporary tag.[5]  On the ticket the deputy wrote "tag not found."  Deputy Foster testified at the suppression hearing that the defendant's hands were shaking and he appeared quite nervous.  After returning the driver's license and documentation, telling the defendant he was free to go, and stepping away from the truck, Deputy Foster turned back and requested permission to search the truck.  The defendant consented and exited the vehicle upon the deputy's request.

Deputy Foster was not with other officers when he asked for consent to search, and he made no threatening gestures to the defendant. The defendant appeared to understand the questions and requests addressed to him as shown in his answers and compliance.  While Deputy Foster searched the vehicle, Deputy Hawks spoke briefly with the defendant.  The defendant told Deputy Hawks that he just purchased the truck from someone he knew and showed Deputy Hawks a bill of sale. Deputy Foster could not find the defendant's name on the document. The defendant said he rode a bus from Arizona to Topeka, Kansas, to buy the truck and was heading back to Arizona.

---

[5]K.S.A. § 8-133 requires that a license plate "to be clearly visible, . . . and in a condition to be clearly legible."  As shown in photographs of the vehicle, the trailer ball on the back of the vehicle partially obscures the tag number when viewed from the rear.

Located underneath the vehicle was a worn spare tire that was not fully inflated and was smaller than the four tires in the bed of the truck. There were also fingerprints in the grease and dirt on the tire that suggested to the officers that it had recently been handled. Once the tire was removed from the undercarriage, Deputy Hawks heard things rolling around inside the tire. He asked the defendant for permission to cut open the tire, and the defendant said that was fine since it was not his tire. Inside were two bags of U.S. currency totaling $20,000.

**TIMELINESS OF MOTION**

The government initially challenges the motion as untimely, as the deadline for filing motions was May 19, 2009, and no extension of the deadline was sought or granted. The defendant was appointed new counsel on June 9, 2009, and his former counsel had not filed any suppression motions. Despite the expired motion deadline, the court will construe the defendant's motion as also seeking leave to be filed out of time and will decide the motion filed by current counsel.

**STANDING**

"Fourth Amendment rights are personal and cannot be claimed

vicariously." *United States v. Valdez Hocker*, 333 F.3d 1206, 1208 (10th

Cir. 2003). "The proponent of a motion to suppress has the burden of

adducing facts at the suppression hearing indicating that his own rights

were violated by the challenged search." *United States v. Allen*, 235 F.3d

482, 489 (10th Cir. 2000) (quotations omitted), *cert. denied*, 532 U.S. 989

(2001). The general Fourth Amendment test for standing is:

> whether the defendant manifested a subjective expectation of privacy
> in the area searched and whether society is prepared to recognize
> that expectation as objectively reasonable. This court has held that,
> in order for a defendant to show such an expectation of privacy in an
> automobile, the defendant bears the burden at the suppression
> hearing to show a legitimate interest in or [a] lawful control over the
> car.

*Id.* (quotations and citations omitted).

For standing to challenge a vehicle search, the Tenth Circuit

recently summarized several relevant principles:

> "[A] defendant need not submit legal documentation showing a chain
> of lawful custody from the registered owner to himself." *Hocker*, 333
> F.3d at 1209. Where, as here, "the proponent of a motion to
> suppress is . . . not the registered owner . . . the proponent bears the
> burden of establishing 'that he gained possession from the owner or
> someone with authority to grant possession.'" *Id.* (quoting *United
> States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990)). We consider:
> "(1) whether the defendant asserted ownership over the items seized
> from the vehicle; (2) whether the defendant testified to his
> expectation of privacy at the suppression hearing; and (3) whether
> the defendant presented any testimony at the suppression hearing

> that he had a legitimate possessory interest in the vehicle." *Allen,* at
> 235 F.3d at 489.

*United States v. Eckhart*, 569 F.3d 1263, 1274-75 (10th Cir. 2009). The

burden rests with the defendant to come forward with evidence establishing

some link between the defendant and the actual owner of the truck. *Id.* at

1275. Even a slight connection to the lawful owner of a vehicle may suffice

for standing. *See United States v. Soto*, 988 F.2d 1548, 1553 (10th Cir.

1993) (finding standing where the defendant stated that he borrowed the

automobile from his uncle, the registration matched his uncle's name, and

the car had not been reported stolen). Absent proof of the defendant's

connection to the lawful owner or a person with authority to grant

possession, no standing exists. *United States v. Betancur*, 24 F.3d 73, 76

(10th Cir. 1984); *United States v. Arango*, 912 F.2d at 445.

      The defendant did not tender evidence or arguments on this

issue at the suppression hearing. Nonetheless, the record is sufficient to

show the defendant's standing to challenge the search. The video

recordings of the traffic stop establish his subjective expectation of privacy,

and the issue remaining is whether this expectation is reasonable. Mere

physical control or operation of a vehicle does not by itself establish a

reasonable privacy expectation.  *See United States v. Martinez*, 983 F.2d 968, 973 (10th Cir. 1992), *cert. denied*, 508 U.S. 922 (1993).  For his asserted interest to be reasonable, the defendant must show "that he gained possession [of the vehicle] from the owner or someone with authority to grant possession" in order to claim this interest.  *Eckhart*, 569 F.3d at 1274 (quotations omitted).

The absence of the defendant's name on the Certificate of Title and on the thirty-day Temporary Permit does not preclude him from having lawful custody of and a reasonable expectation of privacy in the vehicle he was driving.  *Hocker*, 333 F.3d at 1209 (stating that "a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself").  The defendant's statements during the traffic stop, along with other circumstantial evidence, establish that he gained possession from the owner or someone authorized to give possession.

To Deputy Foster, the defendant said he was driving the vehicle for the owner identified in the vehicle's documentation.  To Deputies Hawks and St. Clair, he described his recent purchase of the truck in Topeka as the reason for his trip from Arizona.  Either statement shows he gained possession from the owner.  There is no evidence that the truck was

reported stolen.  The name and address on the truck's temporary tag

registration matched the name and address on the temporary tag

registration on the gold Chrysler Cirrus also parked at the Colfax residence.

Officers witnessed the defendant drive the truck from the Colfax residence

with the apparent knowledge and approval of the individuals who were

exercising control over the truck and who were staying inside the

residence.  The defendant's statements and this circumstantial evidence

establish a link between the defendant's possession of the truck and

someone with authority to give possession.  Having a reasonable

expectation of privacy, the defendant has standing to challenge the search.


## INITIAL STOP

Even if the defendant lacked standing to challenge the search

of the truck, he still could challenge the stop and detention of his own

person and the recovered evidence as fruit of an illegal detention.  *See*

*United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001).  "The

Supreme Court has said there are three types of police-citizen encounters."

*United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007).  The first

type is a consensual encounter that does not trigger protection under the

Fourth Amendment, the second is an investigative detention that constitutes a "Fourth Amendment seizure[ ] of limited scope and duration and must be supported by a reasonable suspicion of criminal activity," and the third type is an arrest that is "the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *Id.* (quotation and citation omitted).

Traffic stops are seizures subject to Fourth Amendment analysis. *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005). Most analogous to investigative detentions, traffic stops are scrutinized for lawfulness under the two-prong analysis set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *Id.* The first prong addresses "whether the officer's action was justified at its inception." 392 U.S. at 20. The second prong is whether the detention "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* The defendant limits his challenge to the first prong.[6]

"A traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any

---

[6]The brief detention for the initial traffic stop appears reasonably related to the grounds for the stop, and the record does not support a viable argument to the contrary.

of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir.), *cert. denied*, 129 S.Ct. 2881 (2009). "For an officer to have reasonable suspicion to seize an individual, the officer 'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000)). Reasonable suspicion is "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7, (1989) (internal quotation marks omitted). A court "looks only at whether the stop was 'objectively justified'; the officer's subjective motives are irrelevant." *United States v. Chavez*, 534 F.3d 1338, 1344 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 953 (2009).

The defendant first contends that K.S.A. § 8-133, the statute cited in the defendant's warning citation, did not provide authority for the traffic stop. In relevant part, the statute provides: "The license plate assigned to the vehicle shall be attached to the rear thereof and shall be so displayed . . . *in a place and position to be clearly visible* . . . and shall be maintained . . . *in a condition to be clearly legible.*" K.S.A. § 8-133 (italics added). At the suppression hearing, Deputy Foster testified that the ball

hitch on the truck obstructed his view of the temporary tag and prevented him from reading the tag while traveling behind the defendant. He had to pull parallel with the vehicle in order to make out the tag number. A photo of the rear of the vehicle presented at the suppression hearing confirms the deputy's testimony.

"[T]he display of an illegible or obscured vehicle tag is a violation of Kan. Stat. Ann. 8-133." *United States v. Orduna-Martinez*, 561 F.3d 1134, 1138 (10th Cir. 2009). "A tag is not positioned to be plainly visible when it is behind a ball hitch that blocks an officer from reading the entire plate while following at a reasonably safe distance. *United States v. Unrau*, 2003 WL 21667166, at *3 (D. Kan. Jun.16, 2003)." *United States v. Rubio-Sanchez*, 2006 WL 1007252, at *1 (D. Kan. 2006). Kansas law requires license plates to be attached to the rear of the vehicle. *United States v. Martinez*, 518 F.3d 763, 767 (10th Cir. 2008). "'[T]he purpose of requiring display of a tag in the first place, and legibility of the tag display,' [is] namely to facilitate 'routine license plate checks.'" *Id.* (quoting *State v. Hayes*, 8 Kan. App. 2d 531, 533, 660 P.2d 1387, 1389 (1983)). Reasonable suspicion for a violation of K.S.A. § 8-133 exists when the officer's view of the temporary tag from behind is blocked by a ball hitch.

*United States v. Rubio-Sanchez*, 2006 WL 297724, at *4 (D. Kan. 2006).

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995), *cert. denied*, 518 U.S. 1007 (1996). Deputy Foster had reasonable suspicion that the defendant's display of the temporary tag behind a ball hitch blocked numbers from a rear view in violation of K.S.A. § 8-133.

At the suppression hearing, the defendant challenged Deputy Foster's credibility on this violation being a reason for the traffic stop. On direct examination, Foster testified he wrote the warning for improper display of the temporary tag behind the ball hitch. During the cross-examination, he acknowledged that he wrote "tag not found" on the citation and had not mentioned improper display in his narrative report. Foster explained on redirect that both reasons for the stop were included on the warning citation but that he did not write a citation for the tag not being on file because it is not a violation. Foster conceded on recross that he did not tell the defendant the stop was based in part on improper display of the tag.

The court accepts as credible Deputy Foster's testimony on what he observed as the grounds for the traffic stop. The recordings of the traffic stop confirm that Deputy Foster believed the temporary tag was improperly displayed as he asked Deputy St. Clair for the statutory citation for that offense. Photographs of the truck show the ball hitch blocked a rear view of the temporary tag's numbers. The court finds that Deputy Foster had reasonable suspicion to stop the truck for a violation of K.S.A. § 8-133.

Deputy Foster's other reason for stopping the truck was dispatch's report that no record was found on the temporary tag. Foster understood this to mean that either the vehicle was not registered or that the state system was in error. He had been trained that such a report justified a traffic stop to check the vehicle's registration. The defendant contends the Kansas Department of Revenue's ("KDR's") procedures for handling temporary tag registrations undermine a finding of reasonable suspicion on nothing more than a temporary tag not being found. The defendant presented the testimony of Raymond Wilk, an acting assistant bureau manager for KDR's Division of Motor Vehicles ("DMV") who oversees the handling of temporary tag registrations. Wilk explained that

licensed Kansas car dealers are required to report a temporary tag within twenty-four hours of its issuance and that the DMV files these daily temporary tag reports.  Wilk pointed out that a dealer's issuance of a temporary tag can be determined only by a DMV search of these daily report files and that law enforcement may request such DMV searches. There was no evidence offered at the hearing indicating that such a DMV search was done or not done prior to dispatch's report to Deputy Foster. For that matter, there was no evidence that dispatch frequently reported incorrect information on temporary tag registrations or that dispatch's report of tag "not found" was inherently unreliable.

Courts have upheld findings that an officer had reasonable suspicion to stop a vehicle and check for proper registration after a computer search showed the license tag was not on file.  *See, e.g., United States v. Stephens*, 350 F.3d 778, 779-80 (8th Cir. 2003); *see also United States v. Campbell*, 549 F.3d 364, 371-72 (6th Cir. 2008) (reasonable suspicion in part to determine whether vehicle was properly registered after a report that the tags "were not on file").  In *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1204 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 933 (2008), the defendant argued the officers relied on information from a state

computer system on "vehicle insurance and registration" that "was too meager to give rise to reasonable suspicion of unlawful conduct, too unreliable, and too stale." A computer check of the license plate number indicated that as of twenty days ago insurance was "not found." *Id.* The Tenth Circuit upheld the finding of reasonable suspicion relying in part on this analysis:

> To be sure, the "not found" response Officer Rapela received from the database did not as definitively indicate criminal activity as a "no" response, but neither did it equate to an exculpatory "yes," and the suggestive ambiguity of the particularized and objective information Officer Rapela had at hand justified his decision to warrant a brief traffic stop-even though it surely would not have sufficed for an arrest. Indeed, the resolution of particularized and objective yet still ambiguous-potentially lawful, potentially unlawful-facts is the central purpose of an investigative detention. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. . . . *Terry* recognized that the officers could detain the individuals to resolve the ambiguity"); *Terry*, 392 U.S. at 22 (recognizing "that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest").

495 F.3d at 1206.

As for the reliability of the information reported by the system, the Tenth Circuit found the record was insufficient to show the system's unreliability or frequency of error. The panel also concluded the reported information

was not so stale as to undermine a finding of reasonable suspicion:

> Here, Officer Rapela's stop was aimed at investigating a possible violation of Utah's vehicle insurance laws, an offense that neither party argues is transitory in nature. He indisputably relied on the most current information available to a patrolling officer. And Mr. Cortez-Galaviz offers us no other evidence or argument to suggest that reliance on a 20 day old alert is in any way or wise unreasonable given the nature of available technology, the offense or detention at issue, or the practical challenges associated with coordinating the dissemination of registration and insurance information for every motor vehicle on the road. Under these circumstances and on this record, therefore, we agree with the district court that a delay of 20 days between an alert and an officer's inquiry does not, by and of itself, nullify a traffic stop on the basis of a "not found" insurance report.

495 F.3d at 1209.

The analysis used in *Cortez-Galaviz* does not compel a different result here. Deputy Foster realized the report of "tag not found" was not definitive of criminal liability, did not rule out the possibility of a valid registration, and did not, however, "equate to an exculpatory" report. 495 F.3d at 1206. Foster testified that he was trained on such a report to conduct a traffic stop to determine the validity of the registration. "Indeed, the resolution of particularized and objective yet still ambiguous-potentially lawful, potentially unlawful--facts is the central purpose of an investigative detention." *Id.* (citation omitted). Finally, the record in this proceeding

does not show that the state's system for maintaining and reporting temporary tag registrations was not timely maintained or was so frequently incorrect that a dispatch's report of tag not found would be inherently unreliable and an insufficient basis for finding reasonable suspicion.

Even assuming the record had shown the dispatch's report of "not found" to be questionably reliable, this case presents additional circumstantial evidence for a reasonable suspicion to question the legality of this truck's temporary tag. SSA Leakey testified that they suspected the temporary tag to have been illegally acquired and so invalid. Earlier that day, the truck had been seen parked in the garage without any license plate. Before it left that afternoon, persons were seen loading the truck with different items, and a temporary tag suddenly appeared on it. Officers knew that other vehicles involved in the drug trafficking ring were using temporary tags illegally purchased from car dealers in Kansas City and surrounding communities. These temporary tags were being used on multiple vehicles associated with this criminal activity, and one or more of the temporary tags did not appear to be valid registrations. This circumstantial evidence combined with the dispatch's report of "not found" provided Deputy Foster with reasonable suspicion to stop the truck and

verify the registration for the temporary tag.[7]

**CONSENT**

In light of the above rulings, the court summarily rejects the defendant's argument that his consent to search was tainted by an unlawful seizure. Though not an issue directly advanced in the defendant's written motion, the court will address the voluntariness of the defendant's consent to search. Following the investigative detention based on reasonable suspicion, Deputy Foster sought to establish a consensual encounter before asking for the defendant's permission to search.

An individual's encounter with law enforcement is consensual if "a reasonable person would feel free to disregard the police and go about his business." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quotations omitted). A traffic stop may evolve into a consensual encounter, for "[o]nce

---

[7]The KBI and DEA instructed the SCS's Office to conduct an interdiction stop. "It is well-established . . . that when an order to stop or arrest a suspect is communicated to officers in the field, the underlying facts constituting . . . reasonable suspicion need not be communicated, so long as the individual agency issuing the order can justify the intrusion on Fourth Amendment rights." *Gonzales v. City of Topeka, Kansas*, 223 F. Supp. 2d 1223, 1229 -1230 (D. Kan. 2002), *see also United States v. Chavez*, 534 F.3d 1338, 1345-48 (10th Cir. 2008) ("DEA task force's knowledge can be imputed" to the patrol officer making the traffic stop), *cert. denied*, 129 S. Ct. 953 (2009).

22

the officer has returned the driver's documents, further questioning amounts to an unlawful detention only if the driver has objectively reasonable cause to believe that he is not free to leave." *United States v. Chavira,* 467 F.3d 1286, 1290 (10th Cir. 2006). "'Whether an encounter can be deemed consensual depends on whether the police conduct would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter.'" *United States v. Bradford*, 423 F.3d at 1158 (quoting *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000)). Under this standard, "an officer is not required to inform a suspect that she does not have to respond to questioning or that she is free to leave." *Id.* A court looks at whether the officer made any "coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled suggesting that the detention had not ended." *Id.* at 1159 (internal quotation marks and citation omitted). "An unlawful detention occurs only when the driver has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way." *Id.* at 1158 (internal quotation marks and citation omitted).

A warrantless search of a vehicle is lawful "if a person in control of the vehicle has given his voluntary consent to the search." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001). "Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances." *Id.* The court uses a two-part test: "First, the government must proffer clear and positive testimony that consent was unequivocal and specific and freely given. Furthermore, the government must prove that this consent was given without implied or express duress or coercion." *Id.* (internal quotation marks and citation omitted).

Before extending the stop with additional questions, Deputy Foster plainly indicated by his words and actions that the traffic stop was over. He handed the defendant back his license and vehicle registration, told the defendant he was "free to go" and to "have a good day," and started walking back toward his patrol car. Deputy Foster then turned back and approached the defendant a second time. He explained that officers were on the look out for illegal drugs and asked if the defendant was transporting any such items. The defendant said no, at which point Deputy Foster asked if he could search the vehicle. The defendant consented and exited the truck at the deputy's request. While walking with the defendant

to the rear of the truck, the deputy asked again if the defendant was all right with the deputy searching the truck. Without any appearance of doubt, lack of understanding or hesitation, the defendant responded affirmatively.

Although other officers arrived during the traffic stop, they did not approach with Deputy Foster or stand near him when he asked for consent to search. Foster testified he did not use a commanding tone of voice and did not draw his weapon during the traffic stop. There is no evidence of threatening gestures or physical movements to suggest the defendant was compelled to consent. As reflected in the video recordings, the defendant had minor difficulties communicating in English, but he never indicated that he did not understand what was being asked of him. The defendant responded appropriately to questions and requests. The video recordings capture the defendant and Deputy St. Clair during the search having a conversation about the weather, ownership of the truck, travel plans, and the difference in time zones. Deputy Hawks testified he spoke with the defendant in English and that he had no real difficulty communicating other than having to repeat a few of his questions. When the tire containing the money was removed from the undercarriage of the

pickup, the officers asked the defendant for permission to cut it open. The defendant gave permission saying it was not his.

The court finds from the evidence that a consensual encounter existed between Deputy Foster and the defendant during which the defendant freely and voluntarily gave consent to search the truck. Officers did not implicitly or explicitly coerce the defendant's consent. The defendant understood the officer was requesting permission to search, and he knowingly gave consent. At no point during the search did the defendant voice any objection to the search. Accordingly, the court denies the defendant's motion to suppress.

IT IS THEREFORE ORDERED that the defendant's motion to suppress the evidence recovered from the pickup he was driving on April 19, 2007, (Dk. 61) is denied.

Dated this 16th day of November, 2009, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge